## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**WILLIAM L. CATHER and BRENDA L. CATHER, husband and wife, CHARLES H. CATHER and LINDA F. CATHER, husband and wife, EVERET P. BICE, JR. and ELIZABETH BICE, husband and wife, and ROBERT JUNIOR HEMPHILL, TRUSTEE OF TRUST A CREATED UNDER THE HEMPHILL FAMILY TRUST DATED OCTOBER 17, 1995, AS AMENDED,**

> ELECTRONICALLY
> FILED
> Dec 07 2017
> U.S. DISTRICT COURT
> Northern District of WV

> **Plaintiffs,**

**v.**

Civil Action No.: 1:17-cv-208 (Keeley)

Judge:

**EQT PRODUCTION COMPANY, EQT GATHERING, LLC (d/b/a "EQT MIDSTREAM"), EQT ENERGY, LLC, EQT MIDSTREAM SERVICES, LLC, EQT CORPORATION, AND EQUITRANS, L.P., all of which corporate entities are foreign corporations operating and doing business within the State of West Virginia,**

> **Defendants.**

## <u>COMPLAINT</u>

On this day came the Plaintiffs, by counsel, John F. McCuskey, Brian J. Warner, and the law firm of Shuman, McCuskey & Slicer, PLLC, and hereby state as follows:

### I.    THE PARTIES AND JURISDICTION

1.    Plaintiffs William L. Cather, Brenda L. Cather, Charles H. Cather, and Linda F. Cather are residents of West Virginia.

2.    Plaintiffs Robert Junior Hemphill, Trustee of Trust A Created under the Hemphill Family Trust Dated October 17, 1995, Everet P. Bice, Jr. and Elizabeth Bice are residents of Ohio.

3.      Defendant entities (hereinafter "EQT") are foreign corporations all of whose principal places of business are located at 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania.  Defendants are each registered to conduct business in the State of West Virginia and, as it relates to this Complaint, conduct business in Taylor County, West Virginia.

4.      The claims set forth in each of the Counts of the Complaint are between citizens of different states, and Plaintiffs are claiming more than $75,000 in damages, exclusive of interest and costs, so that federal jurisdiction is supported by 28 U.S.C. § 1332.

5.      Venue is proper in the United States District Court for the Northern District of West Virginia, pursuant to 28 U.S.C. § 1391(b) and (c) because the EQT Defendants are foreign corporations who are licensed to do business and are doing business therein.

## II.      FACTUAL BACKGROUND

6.      On February 20, 1963, D.L. Cather and Lila S. Cather, his wife, W.L. Cather and Maxine Cather, his wife, and Mary E. Hemphill and Robert J. Hemphill, her husband, signed a lease agreement and leased the oil and gas rights appurtenant to approximately five hundred and four (504) acres which they own in or near Flemington, Taylor County, West Virginia ("Cather Lease") to Equitable Gas Company.

7.      The Cather Lease was recorded in the Office of the Clerk of the County Commission of Taylor County, State of West Virginia, in Book 26, at Page 349.

8.      With regard to natural gas and casinghead gas, the Cather Lease provides that:

[t]he Lessee shall pay to the Lessor for each and every well drilled upon said land, which produces Natural Gas and/or Casinghead Gas in a quantity sufficient for the Lessee to convey to market, a money royalty computed at the rate of one-eighth (1/8) of the wholesale market value which is based on the average current price paid by the Lessee to independent operators in this general area, computed at a 10-ounce pressure basis above 14.7 lbs. atmospheric pressure, payment to be made on or before the 25th day of the month following that in which the gas has been delivered into the marketing pipe line…

2

9.      With regard to Petroleum Oil, the Cather Lease provides:

> [i]f Petroleum Oil is found and saved, the Lessee shall yield and give to the Lessor the one-eighth (1/8) part or share of the same, delivered free of charge into the pipe lines and tanks of the company transporting and storing the oil produced upon said land…

10.     The Cather Lease provides that "the Lessee, at its option, may pay and discharge any taxes…levied, or assessed on or against the land or gas and/or oil in place under the above-described lands; and, in the event it exercises such option, it…may reimburse itself by applying to the discharge of any such…tax…any royalty or rentals accruing hereunder."

11.     EQT, on a monthly basis, deducts "severance taxes" from the gross royalties payable to Plaintiffs.

12.     As more fully discussed hereinbelow, Plaintiffs have requested that EQT clarify or explain the breakdown of the taxes deducted from their monthly statements.

13.     EQT has failed to offer any clarification or explanation of the taxes deducted from Plaintiffs' gross royalties.

14.     Upon information and belief, Plaintiffs' assessed property taxes, in part, require payment of severance taxes that should be paid by EQT.

15.     Upon information and belief, on a monthly basis, EQT deducts "severance taxes" from Plaintiffs' gross royalties, yet does not, or may not, pay the full amounts of deducted taxes to taxing authorities.

16.     The mineral interests contemplated in the Cather Lease were devised and/or deeded, ultimately coming to rest with Plaintiffs.

17.     The interests of Equitable Gas Company contemplated in the Cather Lease passed by assignment to EQT-affiliated companies whose ultimate successor in interest is EQT Production Company.

18.     On or about May 12, 2011, EQT Production Company entered into an Amendment and Ratification of Oil and Gas Lease with Plaintiffs and agreed to modify and amend the Cather Lease to provide for unitization and pooling, shut-in royalty payments, and a presumption of non-abandonment without a release between the parties.  This document did not address or permit deductions of any kind or nature from royalties payable by EQT Production Company or any other company.

19.     The individual Plaintiffs herein were, at all times relevant herein, the current owners, as lessors of a combined 100% interest, in the Cather Lease under which the Defendants have assumed the duty and obligation to perform.

20.     EQT began producing oil, gas, and other hydrocarbon products from the Marcellus Shale formation of the Cather Lease in or around March 2012.

21.     By letter of December 28, 2012, Plaintiff William L. Cather wrote to EQT Production Company's Land Administration/Revenue Accounting Department expressing concern that the net price paid to Plaintiffs under the Cather Lease appeared to be much less than the published natural gas price.  Mr. Cather requested that EQT explain in writing its criteria for determining the price paid and asked how Plaintiffs could verify it.

22.     On that same date, December 28, 2012, Plaintiff William L. Cather wrote to EQT Production Company's Land Administration/Law Department expressing concern that EQT was taking deductions from the gross revenues to be paid to Plaintiffs under the Cather Lease.  Mr. Cather requested a written response from EQT identifying (1) the reason for the deductions and (2) the specific language in the Cather Lease that authorized those deductions.

23.     Plaintiffs received no response to either letter, yet EQT continued to improperly take deductions from the royalties paid to Plaintiffs and, without explanation, continued to

calculate those royalties based on a sales price that did not represent the published natural gas price.

24.     By letter of February 21, 2014, Plaintiff William L. Cather wrote to EQT's then-CEO, David L. Porges, expressing dissatisfaction with EQT's failure to address Plaintiffs' inquiries and its continued underpayment of royalties.  Again, Mr. Cather requested a written explanation from EQT regarding EQT's pattern and practice of underpayment.

25.     EQT failed to substantively respond to Plaintiff William L. Cather's February 21, 2014 letter.

26.     By letter of November 24, 2014, Plaintiff William L. Cather wrote, for the fourth time, to EQT Production Company, expressing growing frustration that, despite nearly two years of requests for written explanations for the improper deductions from royalty payments, the authority for taking those deductions, and the formula by which the royalty payments were calculated, EQT had provided no response.  Mr. Cather again, for the fourth time in writing, requested written responses to these inquiries.

27.     Finally, in response to Plaintiff William L. Cather's fourth written request, on January 8, 2015, EQT wrote that Plaintiffs' "royalty is to be paid '…at the rate of one-eighth (1/8) of the wholesale market value which is based on the average current price paid by Lessee to independent operators in the general area, computed at a 10-ounce pressure basis above 14.7 lbs atmospheric pressure….'  You receive a one-eighth (1/8) royalty based upon the wholesale market value of gas before gathering, compression and processing.  The price EQT receives for the gas is consistent with the price EQT receives for gas produced from other lands in the general area, including EQT's Weston District."

28.     Since March 2012, EQT has taken significant deductions from the royalties owed to Plaintiffs each month, but no explanation has been given for this excessive amount being

improperly deducted, and no legal basis upon which EQT is able to drastically reduce Plaintiffs' royalties has been given.  There is no such legal basis.  EQT has knowingly and intentionally developed a pattern and practice of circumventing the laws of West Virginia, does not provide Plaintiffs with a 1/8th royalty, and EQT recoups the benefits in millions of dollars improperly added to their bottom line revenues.  Unable to engage EQT in meaningful discussion to reach a potential resolution of the post-production deductions, Plaintiffs have filed this civil action in order to rectify the breaches of contract and other duties and obligations owed to them by EQT, and to seek damages and relief from EQT for excessive and improper post-production deductions, pricing violations, and other wrongful tortious, unlawful, and wanton and intentional conduct.

29.     EQT Defendants knowingly and intentionally have calculated Plaintiffs' royalties based on sham transactions to affiliated companies and have unlawfully deducted significant sums from royalties owed to Plaintiffs from March 2012 – the date of first production – until present. Defendants have failed to make payment of interest due under West Virginia law on the corpus of the unlawfully withheld payments.

30.     Past and present royalty checks owed to Plaintiffs by Defendants on production have been, and continue to be, improperly calculated on an artificial price based on an EQT intercorporate non-arm's length transaction between EQT Subsidiaries rather than the actual sales price paid by a non-affiliated third-party purchaser for the oil, natural gas or other products produced from Plaintiffs' leasehold.

31.     Beginning prior to March 2012, and continuing thereafter to the present time, EQT Defendants devised and employed an artifice intended to deceive Plaintiffs and deprive them of the rents and royalties to which they are entitled as follows: Defendant EQT Production Company sells natural gas and other hydrocarbon products produced from the Cather Lease to another EQT Defendant, a related/affiliated entity, at a price which is then used as the basis for the calculation

6

of Plaintiffs' royalties.  The price at which EQT Production sells natural gas and other hydrocarbon products to the related/affiliated entity is determined by a methodology which was agreed upon by the two related entities, but which bears no actual relationship to the price for which the oil, gas, natural gas, and/or NGL's are actually sold to any non-affiliated third party.  This methodology is meant to artificially and fraudulently lower the price for which EQT Production sells natural gas and other hydrocarbon products from Plaintiffs' Leasehold so the royalties paid to the Plaintiffs are minimized, while the profits reaped by EQT when the related/affiliated entity subsequently resells the products at a higher price are maximized.  The EQT Defendant that purchases the oil, gas, and other hydrocarbons at this artificial price received from a related EQT Defendant then resells those products to an unrelated third-party in an actual arm's length transaction, which sale provides EQT with substantially greater profits – to the detriment of the royalty owners – because that sales price is shielded from being subject to Plaintiffs' contractually obligated 1/8 royalty payments.  This last transaction, which represents EQT's actual proceeds from an arms-length transaction, should properly be the basis of the royalty payments to Plaintiffs.

32.     The essential elements of EQT's strategies to deprive Plaintiffs of their rightful royalties from oil, gas, and/or other hydrocarbons became apparent to Plaintiffs on or about March 10, 2017, through letters transmitted to Plaintiffs by EQT through the United States Mail.  On or about March 10, 2017, EQT admitted to Plaintiffs that "EQT Production Company sells the majority of the natural gas it produces at the wellhead to an affiliate, EQT Energy, LLC.  While these sales are to a related entity, EQT Production Company contracts for an objective index price, less the necessary costs incurred to transport the gas to downstream markets.  This pricing formula is designed to obtain the best available wellhead price for both EQT Production Company and its royalty owners."

33.     Despite Plaintiff William L. Cather's numerous requests for a written explanation of the manner by which EQT calculates Plaintiffs' royalty payments, no explanation of the "objective index price" upon which royalties are purportedly based has ever been supplied by EQT. In fact, the March 2017 letter from EQT gave Plaintiffs their first glimpse behind the curtain as to the true nature of the fraudulent scheme employed by EQT to deprive Plaintiffs of their rightful royalties.

34.     Moreover, despite Plaintiff William L. Cather's numerous requests to EQT to provide a written explanation of the provisions of the Cather Lease that authorize the deduction of post-production expenses from royalties due and owing to Plaintiffs, no explanation has been provided.

35.     Instead, with full knowledge that the Cather Lease does not authorize EQT to deduct post-production expenses from royalties due and owing to Plaintiffs, as confirmed by EQT's letter provided to Plaintiffs on or about March 10, 2017, EQT has willfully, wantonly, intentionally, unlawfully, and repeatedly deducted "necessary costs incurred to transport the gas to downstream markets" in violation of EQT's contractual and legal obligations to Plaintiffs.

### III.     GENERAL ALLEGATIONS

36.     During all periods relevant to this action, EQT owned the leasehold estate pursuant to the Cather Lease and had the duty and responsibility to comply with all lease terms and conditions, including the obligation to produce, market, and account for the oil, gas, and other hydrocarbons which the EQT Defendants removed from Plaintiffs' real property and to promptly pay to Plaintiffs all rent, royalties and other monies, exclusive of any deductions or costs (excessive or otherwise), due them based upon the actual price received by EQT from an unaffiliated third-party for said products produced and sold from the Plaintiffs' Leasehold.

37.    On June 15, 2006, the Supreme Court of Appeals of West Virginia in *Estate of Garrison G. Tawney v. Columbia Natural Resources, Inc.* 633 S.E.2d 22 (W.Va. 2006) (the "*Tawney* Decision"), held that the deduction of post-production costs was impermissible except under certain, carefully prescribed, agreements.

38.    The *Tawney* Court held that, in order to allocate post-production costs to royalty owners, a lease "[m]ust expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale[.]"

39.    The Cather Lease does not expressly provide that Plaintiffs shall bear any of the costs incurred between the wellhead and the point of sale.

40.    With full knowledge of the *Tawney* decision, and full knowledge that the Cather Lease does not authorize EQT's deduction of post-production expenses, EQT has devised a scheme by which it unlawfully deducts excessive and improper post-production monetary costs and volumes in calculating the royalties due to Plaintiffs under the Cather Lease.

41.    Moreover, EQT has failed, and continues to refuse, to pay Plaintiffs their rightful 1/8 royalty which, under West Virginia law, is to be calculated as 1/8 of the price received by the lessee from its sale of the oil, gas, natural gas liquids, or other hydrocarbon products in an arms-length transaction with an unrelated and unaffiliated third-party.

42.    Upon information and belief, even though the Cather Lease (1) does not allow EQT to deduct post-production expenses from gross royalties owed to Plaintiffs and (2) requires the calculation of royalties owed to Plaintiffs to be derived from the price received by EQT from the sale of the oil, gas, natural gas liquids, or other hydrocarbon products in an arms-length transaction with an unrelated and unaffiliated third-party, EQT improperly utilizes the "net-back" or "work-back" method to calculate the price which they claim Plaintiffs are due per their royalty.  This method of calculating the price "at the wellhead" by EQT is improper, fraudulent, and violative of

9

the Cather Lease and West Virginia law because EQT Production does not engage in an arms-length transaction with its affiliated, EQT-controlled entity that purchases the gas (and assesses deductions from the purchase price); and because EQT Production's sale to EQT Energy is nothing more than an asset shift or a strawman transaction which EQT utilizes to manipulate the prices of royalties they pay to their lessors, thereby circumventing the laws of the State of West Virginia.

43.    EQT has failed to provide any accounting of the deductions utilized in their calculation under the "net-back" or "work-back" method in order to preclude Plaintiffs from questioning or objecting to the reasonableness of those deductions, thereby circumventing the laws of the State of West Virginia.

44.    EQT utilizes the "net-back" or "work-back" method for the natural gas produced from Plaintiffs' leasehold in order to fraudulently reap revenues from the extraction and sale, or having their agent extract and sell on their behalf, natural gas liquids from Plaintiffs' natural gas, without paying royalties on those revenues.  Proper and legal calculation of royalties using the "net-back" or "work-back" method requires the use of the final sale price of the specific finished product, whether it is natural gas, oil, natural gas liquids, or otherwise, which was originally derived from Plaintiffs' leasehold.  To do otherwise creates an illegal windfall for EQT and harms Plaintiffs as landowners of the State of West Virginia.  EQT Production's asset shift/strawman transaction with EQT Energy, which is blatantly not a "sale" or arm's length transaction, is EQT's only basis for the unreasonable and unjustly low royalties paid to Plaintiffs.  This fraudulent scheme allows EQT to reap millions of dollars from actual market-priced transactions at interstate pipelines with unaffiliated third-party purchasers which are not subject to a 1/8[th] royalty, as they should be.  Consequently, Plaintiffs are provided a fraction of their legal entitlement for the mineral interests which have been in their family for generations.

45.     EQT's scheme has also caused Plaintiffs to incur property taxes which are based on inaccurate assessments provided by EQT to taxing authorities.

46.     EQT has improperly and intentionally deprived and defrauded Plaintiffs of royalties to which Plaintiffs are lawfully entitled under the Cather Lease by failing to pay royalties at the rate calculated on the actual proceeds received by EQT for Plaintiffs' natural gas, oil, natural gas liquids, and other hydrocarbons extracted by EQT from Plaintiffs' leaseholds.

47.     Plaintiffs are entitled to damages for underpayment of royalties which result from the aforesaid wrongful deduction of excessive and improper post-production monetary costs on payments due under the Cather Lease and for EQT's failure to calculate royalties on the actual proceeds received for Plaintiffs' gas, oil, and other hydrocarbons under the Cather Lease.

48.     Beginning in March 2012 and continuing thereafter, EQT has prepared and transmitted a royalty statement through the United States Mail to Plaintiffs, which statement identifies producing wells on the aforesaid leasehold, the "gross" and "owner" volume of production, the "net price" per mcf of gas and oil, but without a showing or description of the actual price received by EQT for the products sold, a breakout of the natural gas liquids or other hydrocarbons sold, or a breakout or description of the deductions being taken by EQT under the Cather Lease.  The aforesaid royalty statements sent to Plaintiffs by EQT are incorrect and deceptive by intentionally omitting the true and correct information that would explain to a reasonable, prudent person whether or not the amounts being paid to Plaintiffs were proper and correctly calculated.

49.     Upon information and belief, EQT sells the natural gas and other hydrocarbon products produced from Plaintiffs' property at a price based upon the BTU content of the gas; however, the royalty statements do not indicate either the BTU content of the gas sold or the price that EQT Defendants received per BTU.

11

50.     As a result of the above, the royalty statements have not provided a full and truthful accounting of the mineral production from Plaintiffs' property, or the manner or amount by which royalties owed to Plaintiffs or deductions taken therefrom are calculated.

51.     The royalty statements to Plaintiffs continue to fail to show the true volume, sale price received, and BTU content of gas, sale price or volume of natural gas liquids and other hydrocarbons produced from Plaintiffs' property or the method of calculation of royalties paid to Plaintiffs by EQT.

## IV.     EQT ENERGY, LLC, EQT PRODUCTION COMPANY, AND ALL OTHER EQT DEFENDANTS ARE ALTER EGOS FOR EQT CORPORATION

52.     Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-51 as if stated verbatim herein.

53.     EQT and its *alter egos* are licensed to conduct business in West Virginia.

54.     EQT and its *alter egos* share the same corporate address of 625 Liberty Avenue, Suite 1700, Pittsburgh, Pennsylvania 15222.

55.     Upon information and belief, EQT Production Company and EQT Energy, LLC, are divisions and/or business segments of/within EQT Corporation, the entity and corporate umbrella for which they operate.

56.     EQT Energy, LLC is "**a division of EQT Midstream**, provides commercial and asset management services to EQT Production, and manages a portfolio of other physical and contractual assets." (*See*, www.eqt.com/our-business/commercial-operations/eqt-energy). However, EQT has since removed and replaced the bolded language in this quotation in its attempt to hide EQT Energy, LLC's alter ego status.

57.     Mr. David L. Porges was the Chairman and CEO of EQT Corporation, as well as EQT Midstream Services, LLC, the general partner of EQT Midstream Partners, LP, and currently is the Executive Chairman of the Board of Directors of EQT Corporation, EQT Midstream

Services, LLC (the general partner of EQT Midstream Partners, LP), and EQT GP Services, LLC (the general partner of EQT GP Holdings, LP). Mr. Porges is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

58.     Mr. Steven T. Schlotterbeck is the Chairman and CEO of EQT Corporation, as well as EQT Midstream Services, LLC, the general partner of EQT Midstream Partners, LP, and he is a director, the President, and CEO of EQT GP Services, LLC, the general partner of EQT GP Holdings, LP, and EQT Midstream Services, LLC, the general partner of EQT Midstream Partners, LP. Mr. Schlotterbeck is also on the Boards of EQT GP Services, LLC, the general partner of EQT GP Holdings, LP, and EQT Midstream Services, LLC, the general partner of EQT Midstream Partners, LP. Mr. Schlotterbeck is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee. Mr. Schlotterbeck was appointed President of EQT in 2015. Mr. Schlotterbeck also was, from 2008 until 2017, the President of EQT Corporation's Production business segment, as well as the Director of EQT Production Company, and Director of EQT GP Services, LLC, the general partner of EQT GP Holdings, LP. Mr. Schlotterbeck became the President of EQT Corporation's Production business segment in 2008 when EQT's business model began its transformation to focus on drilling, production, and midstream operations.

59.     Mr. Jeremiah Ashcroft is a Senior Vice President of EQT Corporation, as well as the president of EQT Corporation's Midstream business segment, a Senior Vice President and Chief Operating Officer of Midstream Services, LLC, the general partner of EQT Midstream Partners, LP. Mr. Ashcroft is also an executive officer and a member of the board of directors of

EQT Midstream Services, LLC, the general partner of EQT Midstream Partners, LP. Mr. Ashcroft is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

60.    Mr. Donald M. Jenkins is the Chief Commercial Officer of EQT Corporation, a Senior Vice President of EQT Corporation, as well as the President and a Manager of EQT Energy, LLC. Mr. Jenkins is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

61.    Mr. Robert J. McNally is a Senior Vice President and Chief Financial Officer (CFO) for EQT Corporation, as well as a Senior Vice President and the CFO of EQT Midstream Services, LLC, and EQT GP Services, LLC, the general partners of EQT Midstream Partners, LP and EQT GP Holdings, LP, respectively. Mr. McNally also serves on the boards of directors for both EQT Midstream Services, LLC, and EQT GP Services, LLC, the general partners of EQT Midstream Partners, LP and EQT GP Holdings, LP, respectively. Mr. McNally is also a director of EQT Production Company and a manager of EQT Energy, LLC. Mr. McNally is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

62.    Mr. David Schlosser is a Senior Vice President of EQT Corporation, President of EQT's Exploration and Production and EQT's Production business segment, as well as a Director and the President of EQT Production Company. Mr. Schlosser is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual

incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

63.     Mr. Lewis B. Gardner is General Counsel and Vice President of External Affairs for EQT Corporation. Mr. Gardner is also general counsel for all EQT affiliates, subsidiaries, and sister companies. Mr. Gardner also serves as a director on the boards of directors of both EQT Midstream Services, LLC, and EQT GP Services, LLC, the general partners of EQT Midstream Partners, LP and EQT GP Holdings, LP, respectively. Mr. Gardner is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

64.     Ms. Jimmi Sue Smith is the Chief Accounting Officer for EQT Corporation. Ms. Smith is also a manager of EQT Energy, LLC, an assistant treasurer of both EQT Production Company and EQT Energy, LLC, as well as the Chief Accounting Officer for both EQT Midstream Services, LLC, and EQT GP Services, LLC, the general partners of EQT Midstream Partners, LP and EQT GP Holdings, LP, respectively. Ms. Smith is also an executive officer of EQT Corporation and is paid in accordance with EQT Corporation's base salary, bonuses, annual incentive award, and long-term incentive awards and additional compensation determined by EQT Corporation and its compensation committee.

65.     Ms. Charlene Petrelli is a Vice President and the Chief Human Resources Officer for EQT Corporation. Ms. Petrelli is also a Director of EQT Production Company. Ms. Petrelli is also the Chief Human Resources Officer for both EQT Midstream Services, LLC, and EQT GP Services, LLC, the general partners of EQT Midstream Partners, LP and EQT GP Holdings, LP, respectively, as well as all of EQT Corporation's subsidiaries.

66.     EQT Corporation's website lists, or formerly did list, "our business" as including EQT Production Company, EQT Energy, LLC, EQT Midstream Partners, LP, "EQT Midstream", and EQT GP Holdings, LP.  (*See*, www.eqt.com/our-business/production.)

67.     EQT Midstream Partners, LP and EQT GP Holdings, LP's website notes, or did note, the following: "Our principal business objective is to increase the quarterly cash distributions that we pay to our unitholders over time, while ensuring the ongoing stability of our business.  We intend to achieve this objective by **growing our assets through pursuing accretive acquisitions from EQT Corporation.**" (emphasis added) (*See*, www.eqtmidstreampartners.com.)  However, EQT has since removed and replaced the bolded language in this quotation in its attempt to hide EQT Midstream Partners, LP's and EQT GP Holdings, LP's status as alter egos.

68.     The stock of the EQT subsidiaries are wholly owned, directly or indirectly, by EQT Corporation.

69.     All EQT subsidiaries, including EQT Midstream Partners, LP, EQT GP Holdings, LP and their general partners, were created by EQT, and EQT is the general manager of all subsidiaries directly or by and through another wholly owned subsidiary of EQT.

70.     The EQT subsidiaries are predominantly staffed with officers and directors of EQT Corporation.

71.     EQT Corporation finances the EQT subsidiaries.

72.     EQT Corporation controls the resources and income its subsidiaries may receive.

73.     The subsidiaries of EQT Corporation have only the capital which EQT Corporation allows them to have, and the subsidiaries are mere departments and part of business segments which do not even have separate addresses. They are all housed in one building, primarily in one office complex in Pittsburgh, Pennsylvania. The resources available to the subsidiaries are subject to EQT Corporation's control.

74.    EQT Corporation prepares loans for subsidiaries if it is needed.

75.    The subsidiaries EQT Corporation have essentially no business except with their parent. EQT Energy does business with some third parties, but its business is primarily with its parent and EQT Production Company is required to utilize EQT Energy. EQT Midstream Partners does some business with third parties, but it also depends on EQT Corporation for most of its revenue.

76.    EQT Corporation's subsidiaries and "business segments" are not stand-alone businesses.

77.    "The boards of directors and officers of the subsidiaries are essentially treated as employees reporting to their supervisors who are officers and directors of EQT Corporation's Board of Directors. EQT Corporation's Board has the say over each subsidiaries' budget, revenue, business, responsibilities, and employees.

78.    The EQT Corporation Board monitors all operations oversight through the appointment of an Audit Committee, and the EQT subsidiaries must get approval for significant expenditures, including capital property expenditures, from EQT Corporation's Corporate Risk Committee.

79.    EQT Corporation disregards corporate formalities by blending ownership and management, using company names interchangeably, by shifting assets and/or monies amongst its affiliated companies and/or subsidiaries, utilizing employees of the EQT entities interchangeably, unfairly and unjustly giving preference to EQT entities over other entities, and by allowing control of the various EQT entities to be held by the same individual(s). Also, EQT Corporation is operating the entities, EQT Production Company, EQT Energy, LLC, and others as if they were, in fact, EQT Corporation; therefore, the various EQT entities have and continue to act as alter egos for EQT Corporation.

17

80.     By failing to observe corporate formalities, blending ownership interests and control in dominant stockholders, and allowing injustice and fundamental unfairness to be perpetuated through sham transactions by structuring the companies and their dealings so as to avoid paying Plaintiffs their proper royalties based upon the proceeds from their sale to an unrelated and/or unaffiliated third party, EQT Corporation has exposed itself to liability for the acts of its alter egos, EQT Production Company and EQT Energy, LLC.

81.     Therefore, since EQT Production Company, EQT Energy, LLC, and other EQT entities were/are alter egos for EQT Corporation, the royalties due to Plaintiffs per the leases held by EQT should have been based upon the sale price of oil, gas, natural gas liquids, or other hydrocarbons received by EQT Energy, LLC, or any other sale price received by an EQT entity or the sale price an entity making sales on EQT's behalf received from an unaffiliated/unrelated third party and not the sale price received by EQT Production Company from EQT Energy, LLC, under their 2005 and 2012 amended gas purchase contract.  The sale to the first unaffiliated/unrelated third-party was the only true sale to actually occur herein because EQT Corporation was merely transferring the oil, gas, and other hydrocarbons to itself through a non-arm's length transaction. This first transaction was done with the sole intention of shielding EQT's realized profits in its later sale at fair market value to an unaffiliated/unrelated third party from being diminished by the rightful royalties owed to Plaintiffs based upon those proceeds.

## V.     FRAUD

82.     Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-81 as if stated verbatim herein.

83.     EQT Defendants, acting in the manner and method as aforesaid, intentionally and knowingly concealed, misrepresented, and/or failed to reveal material information to Plaintiffs related to: (i) volumes, amount, sales price, and BTU of product produced from Plaintiffs' said

Leasehold, (ii) the value of the oil, gas and related products, and (iii) other information, including amount of and description of operating costs regarding the sale of Plaintiffs' gas and related products, which misrepresentations deprived Plaintiffs of the rents and royalties to which they are entitled.

84.     Upon information and belief, EQT devised and operates under the following scheme designed to mislead and deprive Plaintiffs of their contractually owed royalties: EQT Production Company produces the natural gas from Plaintiffs' leasehold, and then sells the gas "at the wellhead" to an EQT affiliated company, EQT Energy, LLC, in a sham transaction at a price artificially set in a gas purchase contract between EQT Production Company and EQT Energy, LLC.  The agreed upon price within that contract is not the actual selling price used by EQT for the oil, gas, or other hydrocarbons produced from Plaintiffs' leasehold.  Plaintiffs' royalty payments are calculated upon the artificial price EQT Energy, LLC, and EQT Production, LLC, have agreed upon.  Thereafter, EQT Energy, LLC, sells the oil, gas, or other hydrocarbons at a price significantly higher than the EQT Production/Energy sale price.  Plaintiffs' royalty payments should be based upon the sale by EQT to an unaffiliated/unrelated third party or parties.  The first transaction, which equates to an asset shifting action within a single corporation because the involved entities are alter egos of EQT Corporation, upon which royalties are based, allows EQT to engage in a secondary sale whereby EQT obtains a higher profit for itself while depriving Plaintiffs of their rightful 1/8 royalty payment from EQT's actual sale proceeds upon which Plaintiffs' royalties should be based.  EQT's royalty statements are based upon the above described fraudulent transaction.

85.     EQT's fraudulent transaction and misrepresentation of the truthfulness in their royalty statements, thereby producing a false and undervalued determination of the overall royalty due to Plaintiffs, are material and false acts wrought upon Plaintiffs by EQT.

86.     Plaintiffs relied upon the truthfulness of EQT's dealings, transactions, and the royalty statements received from EQT in ascertaining the amount of royalty due, and such reliance was justified under the circumstances since EQT provided Plaintiffs with no additional information with which to question such payments or the corporate and contractual structures under and in which EQT's dealings were conducted, until Plaintiffs received EQT's letter (discussed above) on or about March 10, 2017.

87.     Plaintiffs were directly, proximately and foreseeably damaged by EQT Defendants' fraudulent misconduct in that they were denied rents and royalties under the terms of the EQT Lease as required by law.

88.     At various times since obtaining their interest in the subject leasehold and incurring the obligations and duties to the Plaintiffs as aforesaid, EQT has materially misrepresented its obligations and duties to the Plaintiffs under the Cather Lease and under West Virginia law in that, on a monthly basis, EQT provides a royalty statement which knowingly, intentionally and falsely states that EQT is entitled to withhold monies from Plaintiffs' royalty checks, which statement is therefore false and misleading.

89.     At various times since obtaining its interest in the subject leasehold and the corresponding duties and obligations to Plaintiffs, EQT has wrongfully, knowingly, and fraudulently deducted various amounts from Plaintiffs' royalty interest in their leasehold and continue to do so at this time.

90.     Plaintiffs have relied upon EQT's representations, as contained in their monthly statements, to their detriment as to EQT's compliance with the terms of the Cather Lease causing past and future equitable and monetary damages to Plaintiffs.

91.     Plaintiffs made several good-faith attempts to seek clarification on the above described scheme and calculations comprising EQT's misleading and deceptive representations in

their monthly royalty statements.  In response to those good-faith attempts, EQT responded on or about January 8, 2015, with further misleading, deceptive, and fraudulent representations which failed to provide the requested methodology used to calculate the basis of royalties derived from sales of oil, gas, or hydrocarbons from Plaintiffs' leasehold.  Moreover, until Plaintiffs received EQT's letter in March 2017, EQT's responses to the Plaintiffs' numerous requests for clarification never disclosed the fact that the first sale of products produced from Plaintiffs leasehold was being made to a related/affiliated company at an undisclosed price.

## VI.    CIVIL CONSPIRACY TO COMMIT FRAUD

92.    Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-91 as if stated verbatim herein.

93.    In the alternative, should any of EQT Defendants be found to be individual and separate entities from EQT Corporation, then, per the devised scheme outlined above, EQT Production Company, EQT Energy, LLC, and any other named or unnamed co-conspirators which were involved or which discovery reveals have benefitted from the transactions discussed above, entered into a conspiracy to commit fraud against Plaintiffs.

94.    Upon information and belief, EQT Production Company and EQT Energy, LLC, came to an agreement in their gas purchase contract on January 1, 2005, and as amended in 2012. In this gas purchase agreement, the parties agreed as to the methodology of how the sale price of products produced from Plaintiffs' leasehold were to be determined.  This sale and the underlying agreed-to methodology was created to explicitly deprive Plaintiffs of their contractually and legally owed royalties, and to provide EQT with greater profit.

95.    This agreement arbitrarily establishes the undisclosed methodology by which EQT calculates the price that EQT Energy, LLC, would pay for the oil, gas, and other hydrocarbons which EQT Production Company was able to produce from Plaintiffs' leasehold.

96.     The contract price established or calculated by the undisclosed methodology agreed to by EQT Production Company and EQT Energy constitutes an undisclosed price which is not the ultimate price for which EQT has sold the oil, gas, and other hydrocarbons produced from Plaintiffs' leasehold.

97.     This price was calculated using the undisclosed methodology by EQT Production Company and EQT Energy, LLC, in order to deprive Plaintiffs of the full amount of their contractually owed 1/8 royalties, and to provide EQT with higher gross and net profits from a subsequent sale by EQT Energy, LLC, to an unrelated/unaffiliated third party.  The profits from this secondary transaction would not be subject to Plaintiffs' 1/8 royalties because EQT based Plaintiffs' royalties upon the undisclosed arbitrary contract price agreed to between EQT Production Company and EQT Energy, LLC.

98.     The conspiracy was devised and utilized by EQT Production Company, its co-conspirator EQT Energy, LLC, and any other named or unnamed co-conspirators who were involved or which discovery reveals have benefitted from the transactions in such a way so as to defraud and injure Plaintiffs by denying them their rightful 1/8 royalty payments from the actual proceeds realized by EQT, and also to enrich EQT with proceeds gained from a true fair market deal that were not subject to those same contractually owed royalty payments.

## VII.     BREACH OF CONTRACT

99.     Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-98 as if stated verbatim herein.

100.     EQT Defendants are the current lessees of the aforementioned leasehold and have assumed the duty and obligation to perform thereunder.

101.     From at least March 2012 to the present day, EQT Defendants have knowingly and intentionally failed and refused to pay the royalties due to Plaintiffs from the actual proceeds

received by EQT Defendants from their extraction and sale of oil, gas, and other hydrocarbons from the Cather Lease.  For all months from March 2012 through the present day in which payments were made to Plaintiffs, EQT knowingly, willfully, maliciously and wrongfully has withheld payment of over seven hundred thousand dollars ($700,000.00) in royalties due to Plaintiffs.

102.    EQT's failure to pay Plaintiffs the royalty interest owed, equal to 1/8 of the actual sales price and proceeds received by EQT for the sale of the oil, gas, and other products produced from the Cather Lease, without deduction therefrom, is a breach of a contract for which EQT is liable.

103.    As a direct and proximate result of the EQT's breach of contract, Plaintiffs have suffered and continue to suffer loss, damage, and injury.

## VIII.   CONVERSION

104.    Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-103 as if stated verbatim herein.

105.    In accordance with the terms of the aforesaid lease assignment, royalties which are the sole property of Plaintiffs are derived from the sale proceeds of oil, gas and other hydrocarbons by EQT Defendants.  Each month said royalties are collected by, held by, and under the sole control of EQT until paid to Plaintiffs in accordance with the terms of the Cather Lease.

106.    As set forth with particularity in Section II of this Complaint, Plaintiffs, through William Cather, made repeated demands of EQT for possession of the royalties due and owing to, and which were the personal property of Plaintiffs.

107.    As set forth herein, EQT, without justification or explanation, and without Plaintiffs' knowledge or consent, withheld, and continues to withhold, a portion of royalties belonging to Plaintiffs beginning in approximately March of 2012 through the present day.  Before

23

and thereafter, EQT improperly converted to its own use, and failed to pay Plaintiffs hundreds of thousands of dollars in royalties, which amounts rightfully belong to Plaintiffs.

108.   By refusing Plaintiffs' demands for the return of Plaintiffs' royalties, and by converting and making use of said personal property, EQT has intentionally, willfully, and maliciously breached its duties to Plaintiffs and has converted the said monies belonging to Plaintiffs to its own corporate use.

109.   As a direct and proximate result of said breach of duty and conversion, Plaintiffs have suffered and continue to suffer loss, damage, and injury.

### IX.   UNCONSCIONABILITY AND BREACH OF DUTY OF FAIR DEALING

110.   Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-109 as if stated verbatim herein.

111.   EQT Defendants, as the holder and owner of the contractual obligations to Plaintiffs under the Cather Lease, have the same duty to act in good faith and deal fairly with the Plaintiffs as the original lessee(s).

112.   EQT Defendants, without knowledge or consent of Plaintiffs, disregarded and violated their implied covenants to act in good faith toward, and deal fairly with, Plaintiffs in the performance of its duties to Plaintiffs under the said Cather Lease by refusing to pay the royalties due to Plaintiffs from the sale of oil, natural gas, natural gas liquids and related products from at least March 2012 to the present time.

113.   EQT Defendants, therefore, breached their implied covenant of good faith and fair dealing owed to Plaintiffs.

114.   Moreover, EQT withheld, and continue to withhold, monies owing to the Plaintiffs after Plaintiffs notified EQT that the amount being withheld from their royalty payments was improper, unreasonable, and unconscionable.

115.   As a direct and proximate result of EQT Defendants' unconscionable violation of their covenant of good faith and fair dealing to Plaintiffs, Plaintiffs have and continue to suffer monetary loss, damages and injury.

## X.   VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT SECTION 2

116.   Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-115 as if stated verbatim herein.

117.   Defendants violated West Virginia Code § 46A-2-101, *et seq*., including West Virginia Code § 46A-2-127 and § 46A-2-128, by engaging in unfair, unconscionable, fraudulent, deceptive, and misleading debt collection practices by falsely claiming in writing on royalty statements transmitted monthly to Plaintiffs through the United States mail that Plaintiffs owed money to EQT from their oil and gas royalty payouts.  EQT then appropriated, without notice or explanation, Plaintiffs' money in satisfaction of the alleged debt by willfully and unfairly charging Plaintiffs for goods, services, and taxes incurred by EQT in the production, transportation, and sale of oil, natural gas and other products.

118.   As a proximate result of the unlawful conduct of EQT, acting in the manner and method as aforesaid, individual Plaintiffs were damaged in that EQT improperly collected monies, as debts owed by Plaintiffs to EQT, for which improper debt collection individual Plaintiffs are entitled to One Thousand Dollars ($1,000) per each and every violation, adjusted for inflation to date, pursuant to West Virginia Code § 46A-5-101, plus attorney fees and costs pursuant to West Virginia Code § 46A-5-104.

## XI.   VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT SECTION 6

119.   Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-118 as if stated verbatim herein.

120.     Defendants violated West Virginia Code § 46A-6-101, *et seq*., including West Virginia Code § 46A-6-104 by engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce by providing unfair preferential treatments to EQT's affiliated/related entities in deals for products from Plaintiffs' leasehold, by deceiving the Plaintiffs in providing them a false royalty based on a price which was manufactured and kept low by EQT, and by transmitting monthly statements to Plaintiffs through the United States mail stating that Plaintiffs owed money to EQT from their oil and gas royalty payouts. EQT then appropriated, without notice or explanation, Plaintiffs' money in satisfaction of the alleged debt by willfully and unfairly charging Plaintiffs for goods, services, and taxes incurred by EQT in the production, transportation, and sale of oil, natural gas and other products, and utilizing those monies taken from the Plaintiffs to pay back EQT entities and the selling entities' costs and/or recouping those amounts improperly in another manner.

121.     As a proximate result of the unlawful conduct of EQT, acting in the manner and method as aforesaid, individual Plaintiffs were damaged in that EQT utilized and engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, thereby causing the individual Plaintiffs to suffer an ascertainable loss of money or property, real or personal, and are entitled to recover all of their actual damages, which are greater than Two Hundred Dollars ($200.00) pursuant to West Virginia Code § 46A-6-106(a).

## XII.     INTEREST DUE TO PLAINTIFFS ON IMPROPERLY WITHHELD ROYALTY PAYMENTS

122.     Plaintiffs re-plead every allegation contained in the foregoing paragraphs 1-121 as if stated verbatim herein.

123.     For approximately five and a half years, possibly longer, EQT Defendants negligently, knowingly, intentionally, and wantonly improperly withheld, and continue to withhold, significant portions of royalty payments owed to Plaintiffs under the Cather Lease.

Thus, interest, calculable at the statutory interest rate of 7% per annum on the amounts withheld became due to Plaintiffs.

124.    EQT continues to improperly calculate Plaintiffs' royalties, and improperly and illegally take deductions from the improperly calculated royalties, thereby failing to meet their statutory, contractual, and legal obligations to the Plaintiffs.

125.    EQT has improperly withheld over $700,000 in royalties due to Plaintiffs from the wells drilled and producing upon the 504-acre Cather Lease from March 2012 to present.  EQT has improperly withheld the interest owed upon the late payment of royalties under the Cather Lease and, therefore, continue to owe Plaintiffs interest payments at the rate of statutory interest of 7% per annum.

126.    EQT continues to knowingly and/or intentionally refuse and fail to pay the interest payments due to Plaintiffs.

### XIII.    PUNITIVE DAMAGES

127.    The wrongful actions of EQT Defendants as set forth herein were committed wantonly, maliciously, fraudulently, and knowingly, with the intention to cause harm to Plaintiffs and in violation of public policy.  Plaintiffs are, therefore, entitled to an award of punitive damages against EQT to deter those foreign corporations and others from like conduct in the future.

**WHEREFORE**, Plaintiffs respectfully demand, as follows:

a.    That this Court decree that EQT Defendants have breached its contract with Plaintiffs, have acted fraudulently, and have violated the covenant of good faith and fair dealing.

b.    That judgment be awarded against EQT Defendants for all monies unlawfully deducted and retained by EQT from Plaintiffs' royalty interest in the subject leaseholds.

c.    That Plaintiffs be awarded compensatory damages for Defendant EQT's breach of contract and violation of its covenants with Plaintiffs.

d.      That Plaintiffs be awarded compensatory and punitive damages suffered by Plaintiffs as a result of the fraudulent and unconscionable conduct of EQT Defendants.

e.      That individual Plaintiffs be awarded compensatory and punitive damages and equitable relief damages from EQT as provided for under and pursuant to West Virginia Code § 46A-5-101 and 104, *et seq.*;

f.      That Plaintiffs be awarded compensatory damages from EQT for annoyance and inconvenience;

g.      That punitive damages be awarded against EQT Defendants sufficient to punish them for their wanton and malicious corporate acts and to deter them from continuing to act in the unlawful manner toward their Lessors;

h.      That equitable relief be granted to Plaintiffs requiring that EQT Defendants make an accounting to Plaintiffs of all monies received as proceeds from the sale of oil, natural gas, or other minerals or derivative products therefrom produced from the subject Cather Lease from the time of EQT's first production from the Marcellus wells located thereon, and that EQT be required to make an accounting of all monies paid out from these sale proceeds to royalty owners, override royalty owners, lessors, taxing authorities, and/or marketing, transporting, processing, gathering, or other third-party entities up to and including the downstream point of sale of each product to both EQT affiliates or subsidiaries; as well as to non-related third-parties;

i.      That Plaintiffs be awarded prejudgment and post-judgment interest on all sums payable from the time owed of the legal rate of interest from the time the obligation first accrued;

j.      That Plaintiffs be awarded their legal fees and costs incurred in the prosecution of this civil action; and

k.      That Plaintiffs be awarded such other and further relief, both general and special, as the Court deems just and proper.

Plaintiffs demand a trial by jury.

**WILLIAM L. CATHER, BRENDA L. CATHER, CHARLES H. CATHER, LINDA F. CATHER, EVERET P. BICE, JR., ELIZABETH BICE AND ROBERT JUNIOR HEMPHILL, TRUSTEE OF TRUST A CREATED UNDER THE HEMPHILL FAMILY TRUST DATED OCTOBER 17, 1995, AS AMENDED**

**By Counsel**

 _/s/ Brian Warner
John F. McCuskey (WV Bar #2431)
Brian Warner (WV Bar #9372)
**SHUMAN, MCCUSKEY & SLICER, PLLC**
1445 Stewartstown Road, Suite 200
Morgantown, WV 26505
Telephone: (304) 291-2702
Facsimile: (304) 291-2840